Strafford
No. 88-470

THE STATE OF NEW HAMPSHIRE

v.

LARRY ELWELL

December 29, 1989

*John P. Arnold*, attorney general (*Peter G. Beeson*, senior assistant attorney general, on the brief and orally), for the State.

*Joanne Green* and *W. Kirk Abbott*, assistant appellate defenders, of Concord (*Ms. Green* on the brief, and *Mr. Abbott* orally), for the defendant.

BROCK, C.J.   The defendant, Larry Elwell, was convicted after a jury trial in the Superior Court (*Temple*, J.) of negligent homicide, RSA 630:3. He argues on appeal that the trial court committed reversible error by admitting into evidence test results from a blood sample taken from him for the purpose of diagnosis and treatment. For reasons that follow, we reverse and remand.

On the evening of April 18, 1988, police officers John Caldwell and Paul Barnet were in a patrol car headed south on Route 16 in Rochester. They observed a pickup truck approaching them in the northbound lane at a high rate of speed, recorded on radar as sixty-one miles per hour. They activated their blue lights and reversed direction in order to follow the truck. The truck appeared to be accelerating, and the officers lost sight of the vehicle as it rounded a curve and went over a rise in the road. As it went out of view, Officer Caldwell observed the truck crossing the double yellow line and entering the southbound lane. The officers continued their pursuit and came upon the scene of an accident involving the pickup truck and a passenger vehicle.

Diane Kent, accompanied by her fiance, had been driving the passenger vehicle north on Route 16 out of Rochester. At approximately 8:12 p.m., Ms. Kent turned on her left directional signal and began a turn across the southbound travel lane. In the midst of the turn, the pickup truck, approaching from behind, struck Ms. Kent's vehicle in the area of the left front door, and the two vehicles traveled together approximately fifty feet before coming to rest. Ms. Kent subsequently died from injuries suffered as a result of the collision.

The defendant, who was found behind the wheel of the pickup truck, was assisted by the police as he exited the vehicle. On the floor of the pickup truck was an open beer can and a cooler containing ice, water and three more beer cans, two full and one empty. Despite the presence of the beer cans, the police officers did not smell alcohol on the defendant's breath or observe any behavior that would lead them to believe that his ability to drive had been impaired by intoxicating liquor.

The defendant was taken to police headquarters, where he was booked on charges unspecified in the record and released at 9:26 p.m. On his own initiative, he then went to Frisbee Memorial Hospital, where he sought treatment for dizziness and lacerations. At the request of a physician who was working in the emergency room, a blood sample was taken from the defendant at 10:20 p.m. The blood serum was tested and yielded a blood alcohol content of .14 percent.

The following day, an employee of the hospital voluntarily contacted the police to inquire whether the defendant had been arrested for driving while intoxicated. Upon being informed that he had not, the employee notified the police of the existence of the blood sample and provided details of the procedure used by the hospital.

On April 20, two days after the accident, the police obtained a search warrant to seize the remaining portion of the defendant's blood sample. The sample was taken to the State laboratory where the whole blood was tested. The test yielded a blood alcohol content of .12 percent, a result consistent with the hospital's analysis of the blood serum. A blood alcohol content of .10 percent or greater is *prima facie* evidence that a driver of a motor vehicle is under the influence of intoxicating liquor. RSA 265:89 (1982) (current version at Supp. 1988).

On May 19, 1988, the defendant was indicted under two separate subparagraphs of the negligent homicide statute, RSA 630:3. The first indictment, brought under RSA 630:3, I(a), alleged negligent homicide as a result of his driving "at a speed that was not reasonable and prudent ... and by crossing the yellow line." The second, brought under RSA 630:3, I(b), alleged negligent homicide "as a consequence of his being under the influence of intoxicating liquor while driving." The defendant did not attempt to sever the charges or to quash either of the alternative indictments.

Prior to trial, the defendant moved to suppress the results of the tests conducted on the blood sample drawn by the hospital. He contended, *inter alia*, that he was entitled to assert the physician-patient privilege as found in New Hampshire Rule of Evidence 503 and in RSA 329:26. After a hearing on the motion to suppress, the trial court denied the motion, ruling that:

> "Whether the drawing of blood falls within the statutory/ evidentiary privilege is questionable; in balancing the public interest in this criminal case against the defendant's interest in having his confidential communication/relationship protected from disclosure is marginal and must yield in favor of the sensible, efficient administration of justice."

At trial, over the defendant's objection, the State introduced evidence regarding the blood sample taken from the defendant, including the results of the tests performed by the hospital and by the State laboratory. The test results also played an important role in the testimony of an expert witness, called by the State, who testified that the defendant's blood alcohol content could have been no less than .12 percent at the time of the accident.

The defendant was found guilty on both indictments. He was sentenced to three and one-half to seven years at the State Prison on the indictment alleging unreasonable speed and crossing the yellow line. The State did not seek sentencing on the indictment alleging driving while intoxicated.

The defendant argues on appeal that the trial court erred in admitting into evidence the results of the blood tests for alcohol content and the related testimony. He contends that the blood test evidence should have been excluded because it came within the statutory, RSA 329:26, and evidentiary, N.H. R. Ev. 503, physician-patient privilege.

The State argues that the blood tests are not protected by the physician-patient privilege because they are not confidential communications. It argues, further, that even if the hospital test was covered by the privilege, the test conducted by independent State laboratory personnel was not. The State also argues that if such a privilege exists, it should yield because of compelling countervailing considerations and because the defendant placed his physical condition in issue by pleading not guilty. Finally, the State asserts that even if the admission of the blood sample evidence was erroneous, it was harmless error and does not merit reversal of the trial court's ruling.

We begin our analysis by noting that the majority of cases previously decided by this Court with regard to the physician-patient privilege involved civil litigation. *See Nelson v. Lewis*, 130 N.H. 106, 534 A.2d 720 (1987); *In re Kathleen M.*, 126 N.H. 379, 493 A.2d 472 (1985); *State v. Kupchun*, 117 N.H. 412, 373 A.2d 1325 (1977). However, RSA 329:26 (Supp. 1988) provides no indication that the legislature intended the privilege to be distinguishable between civil and criminal matters. Therefore, we will apply the precedents found in prior cases, despite their civil character, to the parties' claims.

■ The physician-patient privilege did not exist at common law. *State v. Kupchun*, 117 N.H. at 416, 373 A.2d at 1327. It was created in our State by statutory enactment in 1969, Laws 1969, ch. 386, and has been incorporated into the rules of evidence, N.H. R. Ev. 503. The privilege is intended to encourage patients to fully disclose information for the purpose of receiving complete medical treatment. *State v. Kupchun*, 117 N.H. at 415, 373 A.2d at 1327. It protects the confidentiality of relations and communications between physician and patient. *Id.*

■ Statutory privileges should be strictly construed, *In re Brenda H.*, 119 N.H. 382, 385, 402 A.2d 169, 171 (1979), according to the common and approved usage of language, *State v. Hart*, 130 N.H. 325, 326, 540 A.2d 859, 859 (1988); RSA 21:2. The statute creating the physician-patient privilege, RSA 329:26 (Supp. 1988), states in pertinent part:

> "The *confidential relations and communications* between a physician or surgeon licensed under provisions of this chapter and his patient are placed on the same basis as those provided by law between attorney and client, and, except as otherwise provided by law, no such physician or surgeon shall be required to disclose such privileged communications. *Confidential relations and communications* between a patient and any person working under the supervision of a physician or surgeon that are customary and necessary for diagnosis and treatment are privileged to the same extent as though those *relations or communications* were with such supervising physician or surgeon."

(Emphasis added.) In interpreting the plain meaning of this statute, *see Theresa S. v. Sup't of YDC*, 126 N.H. 53, 55, 489 A.2d 592, 593 (1985), we find that the boundaries of the privilege extend beyond communications and encompass the "confidential relations" which exist between physician and patient. Although these boundaries are not specified, the statute places the privilege on the same basis as that which exists by law between attorney and client. Therefore, a review of the legal protections afforded attorney-client relations provides guidance in determining the limits of the physician-patient privilege.

We have held that the communications and relations between attorney and client are protected from disclosure by what was known at common law as the attorney-client privilege, *Riddle Spring Realty Co. v. State*, 107 N.H. 271, 273, 220 A.2d 751, 754 (1966), and by the attorney work product doctrine, *id.* at 274, 220 A.2d at 755. Under the attorney-client privilege, any communications made in confidence in the course of obtaining legal advice from a professional legal advisor are protected from disclosure. *Id.* at 273, 220 A.2d at 755. This includes any information, such as reports or appraisals, produced in confidence at the request of the attorney. *Id.* at 274, 220 A.2d at 755. The work product doctrine extends beyond communications and shields from disclosure the results of an attorney's activities conducted with a view toward litigation. *Id.* To be considered work product, the lawyer's work must be that which is normally performed by attorneys and be an essential step in the procurement of data. *Id.*

In interpreting the physician-patient privilege statute, we hold that the limits on the privilege correspond to those found in its attorney-client counterpart. Communications between a

physician and a patient are privileged. This includes information, such as medical reports or test results, generated by a physician as a consequence of the confidential relationship with his patient. In addition, the results of work performed by the physician, or at his direction, which are essential in procuring information necessary for treatment or diagnosis also fall within the statutory privilege and are protected from disclosure.

We conclude that the blood test results produced at the direction of the hospital physician are subject to the physician-patient privilege. In addition, the physical blood sample, which was taken by hospital staff at the direction of the attending physician, is protected from disclosure because it was the result of a routine procedure essential in obtaining information necessary for diagnosis and treatment. Therefore, information acquired by the State from analysis of the blood sample, even though the test was not performed by the defendant's physician, is also subject to the privilege.

We have held that the physician-patient privilege is not absolute and will yield when the disclosure of information is essential. *Nelson v. Lewis*, 130 N.H. at 109, 534 A.2d at 722 (where a plaintiff put her medical condition at issue in a civil malpractice suit); *State v. Kupchun*, 117 N.H. at 415–16, 373 A.2d at 1327–28 (where treatment records of the State hospital were introduced at a defendant's recommitment hearing). This is largely based on the fact that the purpose of the privilege is not to exclude relevant evidence, but simply to facilitate activities which require confidence. *In re Kathleen M.*, 126 N.H. at 382, 493 A.2d at 475. This is consistent with the attorney-client privilege, which will also yield when there is a compelling need for otherwise privileged information. *McGranahan v. Dahar*, 119 N.H. 758, 764, 408 A.2d 121, 125 (1979). This qualification serves the dual objectives of providing essential information while protecting the confidentiality of the relationship. *Nelson v. Lewis*, 130 N.H. at 112, 534 A.2d at 723.

To be essential, the information sought must be unavailable from other sources. *See In re Kathleen M.*, 126 N.H. at 385, 493 A.2d at 476. This prevents a party from depriving his adversary of relevant information by exercising the privilege. *See Nelson v. Lewis*, 130 N.H. at 110, 534 A.2d at 722. This rule avoids undue prejudice which may result from the application of the privilege.

It is true that at the time the police learned of the defendant's blood sample, they had no alternative source of information regarding his blood alcohol content at the time of the accident.

However, they had previously had adequate opportunity to determine whether the defendant was intoxicated. They had observed his behavior while driving, viewed the accident scene, and found the open beer cans in the pickup truck. They had spent over an hour with the defendant and had been able to smell his breath and to watch for signs of intoxication.

The trained police officers were well aware that testing for alcohol in the blood must be conducted within a limited period of time in order to obtain reliable evidence. If probable cause existed, they could have arrested the defendant for driving under the influence, RSA 265:82 (Supp. 1988), and subjected him to the provisions of the implied consent statute, RSA 265:84 (Supp. 1988). Instead, they elected to release him without requesting that he submit to a measurement of his blood alcohol content. It was only after the police were informed of the existence of the blood sample by a hospital employee that they sought to obtain physical evidence of the defendant's intoxication.

We hold that the physician-patient privilege prevents use of the evidence obtained from the defendant's blood sample. The State declined to acquire the information when it had an opportunity to do so and is therefore not unduly prejudiced by the defendant's assertion of the privilege. The blood test evidence, as the State argues, may be essential in order for the State to obtain a conviction, but it does not satisfy the definition of "essential" in the context of abrogating the physician-patient privilege. *See In re Kathleen M.*, 126 N.H. at 386, 493 A.2d at 477.

Under other circumstances, the result may be different. For example, where a defendant is seriously injured in an accident and is taken directly to the hospital, the police may be unable to acquire blood sample readings other than those produced as a result of diagnosis and treatment. Where the police do not have an opportunity to obtain essential evidence, the physician-patient privilege may yield.

The State argues that the effective enforcement of drunk driving laws is a compelling countervailing consideration sufficient to override the defendant's privilege. Although we acknowledge that driving while intoxicated is a deplorable act, *see State v. Goding*, 126 N.H. 50, 52, 489 A.2d 579, 580–81 (1985) (quoting Laws 1981, 543:5), we find no evidence that proceedings involving this particular offense are intended to be exempted from the physician-patient privilege. The legislature has provided in the statute for specific exceptions to the privilege, and proceedings for driving while intoxicated are not among them. RSA 329:26 (Supp. 1988).

We also do not subscribe to the State's theory that by pleading not guilty the defendant waived his physician-patient privilege. This court has held that, where a litigant places her medical condition at issue in a dispute, the privilege may be waived to the extent necessary to provide the opposing party with essential information. *Nelson v. Lewis*, 130 N.H. at 111–12, 534 A.2d at 723. A criminal defendant does not put his medical condition at issue simply by proclaiming his innocence. To hold otherwise would allow the State to defeat the physician-patient privilege simply by accusing a defendant of a crime. We do not believe the legislature intended that result.

Finally, the State asserts that even if the blood sample evidence was privileged, its admission into evidence was harmless error and does not justify reversal of the trial court judgment. The State's contention rests upon the fact that the defendant was found guilty under each of the two alternative indictments, but that he was sentenced on the unreasonable speed and yellow line conviction and not on the conviction for negligent homicide as a result of driving while intoxicated.

To rule that the erroneous introduction of the blood sample evidence was harmless, we must be able to find beyond a reasonable doubt that the inadmissible evidence did not affect the verdict. *State v. Ruelke*, 116 N.H. 692, 694, 366 A.2d 497, 498 (1976). The fact that there was sufficient other evidence to find the defendant guilty is not dispositive. *Id.*

Based upon our reading of the record, we cannot say, as a matter of law, that the introduction of the blood sample evidence did not affect the verdict. The fact that proof of intoxication was not required for conviction under one of the indictments does not mean that the jury's decision on that indictment was not influenced by the results of the blood alcohol tests. Therefore, we conclude that erroneous admission of the evidence subject to the physician-patient privilege was not harmless.

*Reversed and remanded.*

All concurred.