Hillsborough-southern judicial district
Nos. 2002-384
    2002-390
    2002-643

IN RE GRAND JURY SUBPOENA FOR
MEDICAL RECORDS OF CURTIS PAYNE

IN RE GRAND JURY SUBPOENA FOR
MEDICAL RECORDS OF SCOTT CARTA

THE STATE OF NEW HAMPSHIRE

v.

GREGORY BARKA

Argued: July 16, 2003
Opinion Issued: January 6, 2004

*Peter W. Heed,* attorney general (*James D. Rosenberg,* assistant attorney general, on the brief and orally), for the State.

*Law Offices of Paul S. Moore*, of Nashua (*Ghazi D. Al-Marayati* on the brief and orally), for defendant Scott Carta.

*Dawnangela Minton*, assistant appellate defender, of Concord, on the brief and orally, for defendants Gregory E. Barka and Curtis Payne.

*McDonough & O'Shaughnessy, P.A.*, of Manchester (*Robert G. Whaland* and *Robert J. Meagher* on the brief), for defendant St. Joseph Hospital.

BRODERICK, C.J. In these consolidated appeals, the defendants, St. Joseph's Hospital, Scott Carta, Gregory Barka and Curtis Payne, challenge the Superior Court's (*Galway*, J.) decision allowing the State access to the parties' privileged medical records for the purpose of establishing the "serious bodily injury" element of felony aggravated driving while intoxicated. *See* RSA 265:82-a, I(b), II(b) (2002); RSA 265:82-b, I(c) (2002); RSA 625:11, VI (1996). We vacate and remand.

In each case, the defendant was injured in a motor vehicle accident while allegedly operating under the influence of alcohol. Law enforcement personnel were able to observe the defendants at the scene and later at the hospital. The State sought access to the defendants' medical records to determine whether "serious bodily injury" as defined by RSA 625:11, VI resulted from the accidents so that it could prosecute the defendants for felony aggravated driving while intoxicated. *See* RSA 265:82-a, I(b), II(b), :82-b, I(c).

In the Carta and Payne matters, the Hillsborough County Grand Jury issued a subpoena *duces tecum* to the hospital requiring it to produce the medical records for each defendant. In the Barka matter, the State secured an indictment without the use of Barka's medical records but subsequently issued a subpoena to the hospital seeking his records for use at trial. The defendants moved to quash the subpoenas, asserting that their records were protected from disclosure by the physician-patient privilege. *See* RSA 329:26 (Supp. 2002); N.H.R. Ev. 503. The State never contested the privileged nature of the records, but argued that disclosure was essential for it to pursue or continue criminal prosecution. The trial court ruled that disclosure of the defendants' records was essential because the police had insufficient opportunity to assess whether the defendants suffered "serious bodily injury" and because no competent alternative source of dispositive information was available. *See State v. Elwell*, 132 N.H. 599, 605 (1989). Subsequently, the trial court stayed the proceedings to permit interlocutory appeals, which we accepted and consolidated.

By creating the physician-patient privilege, the legislature sought to protect patient health by encouraging patients to fully disclose all information about their injuries or ailments to medical providers, however personal or embarrassing, for the purpose of receiving complete treatment. *Nelson v. Lewis*, 130 N.H. 106, 109 (1987). The legislature also identifies certain conduct as criminal to protect the public welfare. In some instances, the State's ability to investigate and prosecute criminal conduct may depend upon whether it can access privileged medical records, and strict adherence to the privilege could unreasonably undermine this responsibility. We are mindful that permitting law enforcement to have unbridled access to privileged medical records could seriously jeopardize the competing public policy of protecting patient health. It is certainly possible that under those circumstances some individuals might forego medical treatment or hesitate to disclose all relevant facts to medical providers rather than face possible criminal prosecution. In these appeals we are called upon to determine whether their respective circumstances require that the physician-patient privilege yield in favor of the State's professed need to access the defendants' records in order to pursue or continue criminal prosecution.

I

The physician-patient privilege did not exist at common law. It was established by the legislature in 1969, Laws 1969, ch. 386, and was later incorporated into our rules of evidence, N.H.R. Ev. 503. *See Elwell*, 132 N.H. at 603. The privilege statute provides:

> The confidential relations and communications between a physician or surgeon licensed under provisions of this chapter and the patient of such physician or surgeon are placed on the same basis as those provided by law between attorney and client, and, except as otherwise provided by law, no such physician or surgeon shall be required to disclose such privileged communications. Confidential relations and communications between a patient and any person working under the supervision of a physician or surgeon that are customary and necessary for diagnosis and treatment are privileged to the same extent as though those relations or communications were with such supervising physician or surgeon. This section shall not apply to investigations and hearings conducted by the board of medicine under RSA 329, any other statutorily created health occupational licensing or certifying board conducting licensing, certifying, or

disciplinary proceedings or hearings conducted pursuant to RSA 135-C:27-54 or RSA 464-A. This section shall also not apply to the release of blood samples and the results of laboratory tests for blood alcohol content taken from a person who is under investigation for driving a motor vehicle while such person was under the influence of intoxicating liquors or controlled drugs. The use and disclosure of such information shall be limited to the official criminal proceedings.

RSA 329:26.

Traditionally, we have carefully guarded the confidential relationship between patients and their medical providers, *State v. Kupchun*, 117 N.H. 412, 415 (1977), to fulfill the legislature's purpose of encouraging patients to fully divulge personal, and at times, embarrassing, information so their medical providers can, in turn, provide complete and appropriate medical treatment. The preservation of patient health is central to the statutory privilege. Despite its importance, the privilege, however, is "not fixed and unbending," *Nelson v. Lewis*, 130 N.H. 106, 109, 110 (1987), and must yield in the limited circumstances when circumstances warrant, *see, e.g., Kupchun*, 117 N.H. at 416.

When construing the physician-patient privilege, we do so strictly, *see Elwell*, 132 N.H. at 603; *State v. LaRoche*, 122 N.H. 231, 233 (1982), and in recognition that the legislature did not intend for the privilege to compromise the judicial function of ensuring "the just resolution of . . . claims by giving [one party] the right to deprive [another] of relevant information," *Nelson*, 130 N.H. at 110. The legislature designed the privilege "not to exclude relevant evidence, but simply to facilitate activities which require confidence." *In re Kathleen M.*, 126 N.H. 379, 382 (1985). Indeed, much of the information it shields may well be "of little real consequence to society." *Nelson*, 130 N.H. at 109. Confidential medical information pertinent to criminal investigation and prosecution, however, may be of significant consequence to society in some circumstances, and we are reluctant to conclude that the legislature intended the privilege to operate as a cloak for criminal wrongdoing. The proper administration of justice requires that every reasonable effort be made to search for the truth.

■ Our case law supports disclosure of privileged and relevant medical records when: (1) a statute specifically authorizes disclosure, *see In re Brenda H.*, 119 N.H. 382, 384-86 (1979) (superseded on other grounds as recognized by *In re Tracy M.*, 137 N.H. 119 (1993)); (2) a sufficiently compelling countervailing consideration is identified, *see Elwell*, 132 N.H.

at 606; *In re Kathleen M.*, 126 N.H. at 382, 385; or (3) disclosure is essential under the specific circumstances of the case, *see In re Kathleen M.*, 126 N.H. at 385. Here, the State advances two arguments to support its requested disclosure. First, it contends that RSA 631:6, the physician reporting statute, creates an exception to the privilege. Second, it argues that disclosure of the defendants' records is essential. We address each argument in turn.

## II

The State initially contends that under the physician reporting statute, it can compel the hospital to disclose the defendants' medical records because they contain information about injuries caused by criminal acts. The statute provides in pertinent part that:

> a person is guilty of a misdemeanor if, having knowingly treated or assisted another for a gunshot wound or for any other injury he believes to have been caused by a criminal act, he fails immediately to notify a law enforcement official of all the information he possesses concerning the injury.

RSA 631:6, I (1996). The State argues that a fair reading of the statute allows it to obtain privileged medical records by subpoena when it believes that medical providers have failed to comply with their reporting obligations. We disagree.

Our task in interpreting a statute is to ascertain "the intent of the legislature as expressed in the words of a statute considered as a whole." *Brewster Academy v. Town of Wolfeboro*, 142 N.H. 382, 383 (1997). "We look . . . to the statutory language itself, and where possible, we ascribe the plain and ordinary meanings to words used." *Id.*

According to its plain language, the reporting statute requires those who treat or assist in treating injuries they believe were caused by criminal wrongdoing to promptly report to law enforcement all information they possess about the injuries. The statute imposes an obligation upon treating and assisting medical providers which, if breached, can result in criminal liability. This obligation may require medical providers to divulge information otherwise privileged under RSA 329:26. It does not, however, provide the State with unilateral authority to subpoena privileged records when it believes that medical providers may have breached their reporting obligations. We need not decide whether the reporting statute would allow the State to seek an injunction or other court remedy to access privileged records in the event it believes a medical

provider has failed to comply with the statute's reporting mandate as that issue is not before us.

## III

The State next argues that disclosure of the defendants' medical records is essential for it to adequately investigate and establish the "serious bodily injury" element of felony aggravated driving while intoxicated. The parties, however, dispute the showing the State must make before access is allowed. We begin, therefore, by reviewing the appropriate standard governing disclosure.

■ The physician-patient privilege may be abrogated in certain narrow circumstances when disclosure of privileged information is essential. *Elwell*, 132 N.H. at 605. To establish essential need, the party seeking the privileged records must prove both that the targeted information is unavailable from another source and that there is a compelling justification for its disclosure. *See In re Kathleen M.*, 126 N.H. at 385; *McGranahan v. Dahar*, 119 N.H. 758, 764 (1979). In these appeals, the State seeks medical records to establish an element of a felony criminal offense. *See In re Kathleen M.*, 126 N.H. at 385 (disclosure in involuntary commitment setting may be essential where psychiatrist believes patient's mental illness created potentially serious likelihood of danger to self or others and psychiatrist's testimony was only available source for such information); *Elwell*, 132 N.H. at 606 (disclosure in drunk driving setting may be essential if defendant was seriously injured and transported to hospital without police having adequate opportunity to obtain essential evidence of defendant's intoxication). The investigation of felonies and the search for relevant evidence constitute a compelling justification to support invasion of the privilege.

■ ■ Having established a compelling justification in these cases, the State must still show that it has no reasonably available alternative sources it can use at trial to prove the "serious bodily injury" element of felony aggravated driving while intoxicated. "Serious bodily injury" is defined as "any harm to the body which causes severe, permanent or protracted loss of or impairment to the health or of the function of any part of the body." RSA 625:11, VI. In determining whether a reasonable alternative source of information is available to the State for it to pursue criminal prosecution of the defendants without access to their medical records, we consider: (1) whether the alternative evidence is admissible at trial; (2) whether the alternative evidence is sufficient to overcome a

motion for directed verdict; and (3) whether the State has made adequate efforts to investigate alternative sources. We examine each prong in turn.

The admissibility component of the "availability" inquiry is self-evident. Inadmissible evidence is useless to the State in establishing an element of a felony offense and thus, for practical purposes, is non-existent to the State. *See, e.g., State v. Favreau*, 134 N.H. 336, 339 (1991) (hearsay evidence rarely admissible at trial). Likewise, the sufficiency component acknowledges the practical utility of any alternative evidence. It would be futile, and perhaps ill-advised, for the State to pursue a felony charge for which the underlying evidence would not withstand a motion for directed verdict at the close of the State's case. *See State v. Brown*, 132 N.H. 321, 328 (1989) (to survive a motion for directed verdict, the evidence and all reasonable inferences therefrom construed in State's favor must be sufficient for rational trier of fact to find defendant guilty beyond reasonable doubt of charged crime). We recognize that circumstances may arise where alternative evidence could sustain a grand jury indictment but not withstand a motion for directed verdict because a grand jury indictment may rest entirely upon hearsay, *State v. St. Arnault*, 114 N.H. 216, 218 (1974), and represents only the grand jury's conclusion that probable cause exists to believe the defendant committed the charged crime, *Moody v. Cunningham*, 127 N.H. 550, 554 (1986). Even at the grand jury stage, therefore, the State's ability to access medical records must be assessed for its intended use at trial. After all, the proper purpose in securing an indictment is to pursue prosecution of an alleged crime to its conclusion.

With respect to the adequacy of the State's investigative efforts, piercing the physician-patient privilege demands that the State make substantial, good faith efforts to discover alternative sources of competent evidence. Invasion of the privilege can never be justified just because a defendant's medical records might be the best evidence of "serious bodily injury" or provide the least burdensome means to pursue a felony prosecution. *Compare In re Kathleen M.*, 126 N.H. at 386 (mere conclusory statement that treating physician offers best evidence as to dangerousness is insufficient to establish necessity), *with Kupchun*, 117 N.H. at 415-16 (without disclosure of privileged records as best information available bearing on defendant's dangerousness and mental condition, State would have been "virtually deprived" of evidence to present to trial court in recommitment hearing). On the other hand, it would be impracticable and pointless to require the State to exhaust investigative avenues that offer only slight potential for revealing competent alternative evidence.

■ The adequacy of the State's investigative efforts is, at least initially, a question of fact for the trial court to resolve. To this end, the State must make an offer of proof demonstrating substantial, good faith efforts to discover alternative sources of competent evidence. The trial court cannot accept bald conclusions by the State that alternative sources are non-existent or futile to explore. *See In re Kathleen M.*, 126 N.H. 379, 385-86 (1985).

■ We recognize our continuing obligation to carefully guard the physician-patient privilege, *see Kupchun*, 117 N.H. at 415, and though the privilege is strictly construed, *see Elwell*, 132 N.H. at 603, we are mindful that any intrusion into the confidential sphere must be circumspect to honor the legislature's design to preserve patient health. In some cases, the trial court may decide that disclosure of privileged information is not warranted even though the prosecution will be unable to prove its case. Therefore, to ensure careful consideration be given to the "unavailability" prong and that a sufficient record be created for appellate review, we conclude that the trial court must make explicit findings and rulings on each dispositive prong of its decision to either grant or deny access to privileged medical records. With this matrix in mind, we turn our attention to the merits of each case before us.

In Carta, law enforcement responded to the scene of a reported two-car accident on September 10, 2001. A police officer saw the defendant on the ground with several facial lacerations and a bleeding head wound. Emergency medical technicians (EMTs) carried the defendant on a stretcher to an ambulance and told the officer that the defendant had suffered a severe forehead laceration and that the trauma team had been activated. At the hospital, the officer learned that the defendant underwent surgery and was placed in the intensive care unit. He observed more than two inches of stitches across the defendant's forehead.

The trial court concluded, and no one disputes, that "the defendant's laceration alone does not constitute sufficient evidence to satisfy the statutory requirements of serious bodily injury." We agree that the police officer's observation of Carta's head wound would not be sufficient to withstand a motion for directed verdict. The trial court, however, failed to consider other surrounding circumstances that may be pertinent to the nature and extent of Carta's injury. In particular, it failed to consider the import of Carta's surgery and of his placement in the intensive care unit. Further, the record provides no detail on the existence of competent alternative evidence revealing the nature and scope of Carta's surgery, *e.g.*, whether it related to his forehead suturing or some other procedure or

injury. Nor does the record reflect whether competent alternative evidence exists explaining why or how long Carta was placed in the intensive care unit.

Although the State admitted that it did not interview Carta's neighbors and co-workers to further investigate the extent and cause of his injuries, the trial court ruled that such individuals would not be competent to testify and, thus, their statements "would not constitute sufficient evidence to cause the [medical records] to be deemed non-essential." The court's ruling, however, was premature because the State had made no attempt to even contact such potential sources. It is currently unknown whether Carta's neighbors, co-workers, or others in contact with him, might disclose information that would be admissible at trial and sufficient to withstand a motion for directed verdict. Accordingly, we vacate the court's ruling that disclosure of Carta's medical records was essential, and remand for it to resolve whether the State currently has competent evidence available to it to withstand a motion for directed verdict and if not, whether the State has made appropriate investigative efforts to discover other sources of competent evidence.

Defendant Carta also argues that before confidential medical records can be disclosed, the State must demonstrate a reasonable probability that the information sought exists within the material requested. *See State v. Gagne*, 136 N.H. 101, 105-06 (1992). Even assuming that *Gagne* requirements apply here, we conclude that a reasonable probability exists that Carta's records may contain evidence that he suffered serious bodily injury because hearsay evidence shows that he incurred a severe forehead laceration, underwent surgery and was placed in the intensive care unit.

In Payne, law enforcement responded to the scene of a motor vehicle accident and observed the defendant unconscious. At the hospital, a police officer learned that the defendant remained unconscious and non-responsive. The officer personally observed the defendant in this same condition but noticed no blood, broken bones or visible injury. The defendant stayed in the intensive care unit for some undisclosed period of time, and was later discharged to a rehabilitation facility. When attempting to later contact the defendant, the police officer was told that he remained in the same condition with only moments of consciousness.

The trial court ruled that the police officer's testimony that the defendant was unconscious "does not constitute sufficient evidence to cause the [medical records] to be deemed non-essential." We agree. The officer observed the defendant on a stretcher in an unconscious state immediately after the accident but was not able to discern the nature or extent of his injuries. Only hearsay statements of hospital personnel could

establish Payne's apparent prolonged state of unconsciousness and discharge to a rehabilitation facility. Although the officer's direct observations suggest that Payne may have suffered more than a minor injury, we conclude that this evidence, standing alone, is insufficient evidence to withstand a motion for directed verdict.

The trial court, however, made no finding as to the adequacy of the State's investigative efforts to discover competent alternative evidence to establish the nature and extent of Payne's injury. Certainly, evidence admissible at trial showing that Payne remained unconscious for an extended period of time, (such as the weeks of unconsciousness suggested by the hearsay evidence in this case), would be sufficient to withstand a motion for directed verdict, and, thus, obviate any essential need for disclosure of his privileged medical records. Accordingly, we vacate the trial court's ruling of "essentiality" and remand for it to resolve the investigation issue in accordance with the standard set forth in this opinion.

Finally, in Barka, the defendant was involved in an off-highway accident while operating a recreational vehicle. The police responded to the scene and observed EMTs place the defendant on a backboard and support his neck with a brace. An EMT told the officer at the accident scene that the defendant was experiencing numbness in his arms and legs. The officer later observed the defendant in his hospital room with the backboard and neck brace, and thought he appeared to be seriously injured. He learned from a nurse at the hospital that the defendant had broken his neck and that his injuries could be life-threatening if he was disturbed.

The hospital argued before the trial court that disclosure of Barka's medical records was not essential because evidence of his serious bodily injury was available from other sources. It specifically referred to the nurse's statement to the officer that the defendant had a broken neck with life-threatening consequences, the EMT's statement to the officer that the defendant experienced numbness in his extremities, and the officer's own observations. While the State argued that this information was inadmissible and also insufficient to prove the injury element beyond a reasonable doubt, the trial court ruling related to the sufficiency of the police officer's observations. It concluded that the officer's testimony "[did] not constitute sufficient evidence to cause the [medical records] to be deemed non-essential," and, thus, the officers in this case had no opportunity to obtain essential evidence regarding whether the defendant suffered serious bodily injury.

The officer's observation of Barka on a backboard wearing a neck brace immediately after the accident and soon thereafter does not, by itself,

establish that Barka suffered "serious bodily injury." Medical personnel could have been using precautionary measures. Further, the defendant's disclosure to the EMT at the accident scene that he was experiencing numbness in his extremities would constitute only marginal evidence of "serious bodily injury," and could not withstand a motion for directed verdict. The nurse's statement that Barka suffered a broken neck, however, if admitted at trial, could stand alone to establish the injury element of felony aggravated driving while intoxicated. The trial court made no finding as to whether this evidence would be admissible at trial. Further, the trial court made no finding concerning the adequacy of the State's investigative efforts to discover competent evidence apart from Barka's medical records. Accordingly, we vacate the trial court's ruling and remand for it to resolve these issues in accordance with the standards set forth in this opinion.

## IV

We now turn to the hospital's concern that the State be required to follow a uniform and fair process when seeking disclosure of privileged medical records. In the Payne case, the initial grand jury subpoena was directed solely at the hospital. The trial court granted the hospital's motion to quash, ruling that due process required that defendant Payne receive notice of the attempt to gain access to his medical records. While the State did not appeal the trial court's ruling, the hospital fears that in future cases, its compliance with a grand jury subpoena for medical records without notice to the patient would violate the physician-patient privilege and expose it to tort liability for invasion of privacy. On the other hand, the hospital feels inhibited from informing patients of a grand jury subpoena for medical records for fear of violating the secrecy of grand jury proceedings. It appears that in the Barka and Carta cases, subpoenas were directed to both the hospital and the defendants.

Proceedings before a grand jury are sacrosanct and thus "investigations and deliberations of a grand jury should be conducted in secret, and . . . for most intents and purposes, all its proceedings should be legally sealed against divulgence," *State v. Williams*, 142 N.H. 662, 665 (1998) (quotation omitted). We conclude, however, that for a defendant to protect his statutory privilege, the State must furnish him with adequate notice of its effort to obtain his medical records. Therefore, any subpoena issued to a hospital or medical provider to obtain privileged medical records must also be served upon the individual whose records are sought.

Either the defendant or the medical provider or both may file a motion to quash or otherwise object to disclosure of the requested records.

█ Finally, we acknowledge our continuing obligation to carefully safeguard the statutory protection afforded the confidential relationship between physicians and patients. To that end, we hold that if a party objects to the production of medical records and the State can establish a legal right to override the physician-patient privilege, the trial court is required to conduct an *in camera* review. In the course of that review, the trial court should make certain that irrelevant and non-responsive information is not released. We emphasize that only information necessary to prove serious bodily injury should be disclosed. Other information, such as the defendant's medical history and statements to his physician, would not normally be revealed. If, in fact, the information sought does not exist in the records, there is no risk that privileged records will be turned over to the State.

*Vacated and remanded.*

NADEAU, DALIANIS and DUGGAN, JJ., concurred.