STATE OF CONNECTICUT *v.* DAVID
PAUL LEGRAND
(AC 30577)

DiPentima, C. J., and Bear and Stoughton, Js.

240

Argued October 29, 2010—officially released June 7, 2011

*Jon L. Schoenhorn*, with whom, on the brief, was *Sara J. Packman*, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Anthony J. Spinella*, assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, David Paul Legrand, appeals from the judgment of conviction, following a court trial, of operating a motor vehicle under the influence of drugs in violation of General Statutes § 14-227a, failure to keep a narcotic drug in the original container in violation of General Statutes § 21a-257 and

being a repeat offender pursuant to General Statutes § 14-227a (g) (2). On appeal, the defendant claims that (1) the use by the state of a subpoena, rather than a search warrant, to obtain his medical records violated his federal and state constitutional rights, (2) the trial court improperly found that his medical records were not privileged statutorily, (3) there was insufficient evidence to support his conviction under General Statutes § 21a-257 and (4) General Statutes § 21a-257 is unconstitutionally vague as applied to his conduct. We are not persuaded and, accordingly, affirm the judgment of conviction.

In an oral decision, the court found the following facts. On May 18, 2007, the defendant operated a motor vehicle in an erratic manner in South Windsor. A police officer observed the defendant as he failed to obey a stop sign, followed another vehicle too closely and swerved into a lane of oncoming traffic. The officer then effectuated a stop of the defendant. The defendant claimed that his erratic driving was the result of attempting to locate a cellular telephone that he had dropped on the floor of his vehicle. While speaking to the defendant, the officer noticed his slurred speech.

The defendant was unable to perform the horizontal gaze nystagmus sobriety test because he failed to follow the officer's directions. At one point, his eyes rolled back into his head, and he nearly fell to the ground. The defendant also failed both the one leg stand and the walk and turn sobriety tests. At this point, the defendant was taken into custody.

The police officers conducted a search of the defendant's vehicle and discovered seven pills in the center console. The defendant admitted that he had been carrying the pills in his pocket and that he placed the pills, five of which were narcotics, in the console. At the

police station, the defendant stated that he was physically unable to provide a urine sample.[1] The defendant fell asleep both in the police vehicle and at the station.

In its decision, the court addressed the defense that any narcotics in his system did not have an intoxicating effect because he had become stabilized and tolerant of the medications. In support of this theory, the defendant presented the testimony of Herbert Reiher, his treating physician and an expert regarding the effect of the defendant's medication on his ability to operate a motor vehicle safely, and John Mendelson, a clinical pharmacologist and physician.[2] Mendelson never examined the defendant or reviewed his medical records; instead he testified as an expert on the pharmacological effects of medication on patients, including their ability to operate a motor vehicle safely.

Both Reiher and Mendelson testified that the narcotics taken by the defendant would not have affected his ability to operate a motor vehicle safely if he had been taking the medications for longer than one month, was stabilized on the medications and had been taking the medications as prescribed. The court noted that it did not credit much of Reiher's testimony, specifically, that the defendant was stabilized on medications and that he was taking them as prescribed as of the date of the motor vehicle incident. "In fact, the court finds that Dr. Reiher's testimony, in conjunction with the other established facts in the case, demonstrates precisely the opposite conclusion, that the defendant was in fact abusing the medications."

In support of this finding, the court pointed to the evidence that the defendant had attempted to obtain

---

[1] There was evidence that insufficient time existed to transport the defendant to the hospital and have a blood sample drawn.

[2] As a treating physician, Reiher was permitted to give an expert opinion as to the defendant's physical condition. See C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 7.9.1, p. 429.

early refills, he twice had reported his narcotic medication had been stolen and, when he requested a change from the generic to a name brand narcotic, he failed to return most of the unused generic brand. Additionally, the court found that at the time of his arrest, the defendant was carrying quantities of medication that he would not have needed for a short trip out for something to eat. The court expressly found that the defendant "was not taking his medication as prescribed, but was in fact taking them in excess of the amounts prescribed."

Although the court did credit most, if not all, of Mendelson's testimony regarding the disappearance of the intoxicating effect of narcotics when taken properly, it noted that "this [phenomenon] does not occur if the patient takes the medications in amounts above those prescribed . . . ." Because Mendelson neither treated the defendant nor reviewed his medical records, he could not opine on whether the defendant was stabilized on the medications or whether he was taking them in accordance with the prescriptions.

The court found the defendant guilty of violating § 14-227a and § 21a-257. The defendant then admitted to being a subsequent offender. The court sentenced the defendant to a total of two years incarceration, suspended after 200 days, and three years of probation.[3] This appeal followed.

I

The defendant first claims that the state's use of a subpoena, rather than a search warrant, violated his federal and state constitutional rights. Specifically, he

[3] Pursuant to General Statutes § 21a-255 (b), the penalty for a first violation of § 21a-257 is a fine of not more than one thousand dollars or imprisonment for not more than two years or both.

argues that the state seized his medical records in violation of the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution. We are not persuaded.

On August 5, 2008, the state served a subpoena on Reiher seeking both his presence and "all medical records of treatment and medications for [the defendant] from [January 1, 2007, to August 1, 2008]." As a preliminary matter, the prosecutor indicated that he had subpoenaed Reiher, whom he expected to testify on behalf of the defense. With respect to the medical records that had been subpoenaed and delivered under seal to the court clerk, the prosecutor requested that they be unsealed in anticipation of Reiher's testimony.

Defense counsel indicated that he had been unaware of the state's subpoena. He did not consent to disclosing the defendant's medical records, although he did agree to allow Reiher to testify only once, rather than being called by each party. Defense counsel then noted that the defendant had not waived his right to privacy under either federal law or the medical privilege regarding the prescriptions used by Reiher in treatment. In a discussion with the court, defense counsel indicated that he was unsure as to whether psychiatric records were included in the medical records submitted by Reiher.

The prosecutor stated that through the defendant's responses to the state's discovery requests,[4] he learned that the defendant intended to call Reiher as a witness

---

[4] On August 8, 2008, pursuant to Practice Book §§ 40-13 (b) and 40-26, the prosecutor filed a motion for disclosure. On August 15, 2008, the defendant complied with this motion, and included in the materials sent to the state was a department of motor vehicles form filled out by Reiher on behalf of the defendant. Reiher indicated that the defendant was taking his medication properly and abstaining from alcohol or illicit drugs. He opined that the defendant had no medical matters that would affect his ability to operate a motor vehicle safely. Reiher completed the form on May 25, 2007, one week after the defendant's arrest.

who would render an opinion and therefore he was entitled to the documents upon which the opinion was based. The prosecutor presumed that Reiher would testify that because the defendant had been on certain medications "over a number of years, and he has grown a tolerance for those drugs, which allow him to drive a motor vehicle properly."

Defense counsel indicated that neither he nor the defendant had been contacted by Reiher prior to his complying with the subpoena. The court inquired whether the medical records were confidential. Defense counsel argued first that he was unsure as to the scope of the records sought by the state's subpoena. Defense counsel suggested that the time period of January through May, 2007, would be relevant and, therefore, any records from 2008 would be irrelevant. The defense counsel then turned to the physician-patient privilege. Last, he argued that the state had engaged in a "fishing expedition" in the hope of finding material to cross-examine Reiher.

When asked by the court, defense counsel stated that the defendant would not consent to an in camera review. Defense counsel argued that he did not know precisely what records had been submitted by Reiher and requested that a different judge review the materials.

The court ordered the medical records turned over to both the state and defense. It further ordered that they not be disclosed beyond the proceeding to a third party except as necessary to develop a claim in the case or to address an evidentiary or factual issue. The court then explained the rationale for its ruling. "My ruling is based upon a lack of sufficient showing by the defendant that the records contained therein are privileged in this proceeding. I've heard no—I've been given no authority that the state is not entitled to these

records in light of the fact that one of the defendant's witnesses is going to testify as to the defendant's tolerance to certain medications. Obviously, that's going to be a critical issue in this case. And medical records that involve the defendant's medications, what types of medication he had been prescribed, for [how] long he has been prescribed those medications—it seemed to me it would be plainly relevant to some of the factual issues in this case. Accordingly, I'm ordering that they be disclosed."

Later that day, defense counsel indicated that he had discovered that certain psychological reports had been included in the materials furnished by Reiher. These records were returned to the court. The next day, the court noted that some of the records contained psychiatric information pertaining to the defendant, as well as documentation of some emergency room visits that occurred prior to his arrest. The court further noted that defense counsel had raised an objection on the basis of the patient-psychiatrist privilege. The court, after receiving the defendant's consent, conducted an in camera review of these specific records and, with a few exceptions, determined that the materials should be turned over to the state.

Defense counsel then stated that although the state's subpoena had requested the defendant's medical records from January 1, 2007, to August 1, 2008, Reiher had included eight to nine years of medical records. Additionally, for the first time, defense counsel argued that a warrant was necessary to obtain these records. The court responded that the state had made a sufficient showing to permit the general disclosure of medical records from January 1, 2006, to August, 2008.

On appeal, the defendant claims that a warrant was required to seize the defendant's medical records[5] that

[5] The type of medical records sought by the prosecuting authority will be a significant fact in deciding whether a defendant's fourth amendment or corresponding state constitutional right has been violated. For example, in

were held in the custody of Reiher. Specifically, he argues that he had an expectation of privacy in the records that society would recognize as reasonable[6] and therefore both the fourth amendment[7] to the United States constitution and article first, § 7, of the Connecticut constitution required the state to obtain a search warrant rather than use a subpoena. Because the defendant raises claims of law, our review is plenary. *State* v. *John G.*, 100 Conn. App. 354, 359, 918 A.2d 986, cert. denied, 283 Conn. 902, 926 A.2d 670 (2007); see also *State* v. *Gibson*, 270 Conn. 55, 66, 850 A.2d 1040 (2004); *State* v. *Butler*, 262 Conn. 167, 174, 810 A.2d 791 (2002).

For the purposes of our discussion, we assume, without deciding, that the state seized the medical records[8] and the defendant exhibited a subjective expectation of privacy and that expectation was objectively reason-

---

*State* v. *Guido*, 698 A.2d 729, 733–34 (R.I. 1997), the Rhode Island Supreme Court held that a defendant does not have a legitimate expectation of privacy in the results of a blood alcohol test. See also *Tims* v. *State*, 711 So. 2d 1118, 1123 (Ala. Crim. App. 1997) (same); *People* v. *Perlos*, 436 Mich. 305, 325, 462 N.W.2d 310 (1990) (same); *Garcia* v. *State*, 95 S.W.3d 522, 526 (Tex. App. 2002) (same). In *State* v. *Szepanski*, 57 Conn. App. 484, 488, 749 A.2d 653 (2000), we appear to have reached a similar conclusion; however, in that case we concluded that the defendant failed to brief the issue adequately.

The United States Court of Appeals for the Fourth Circuit expressly has held that records from a substance abuse treatment center fall "within [the] ambit of the Fourth Amendment's protections." *Doe* v. *Broderick*, 225 F.3d 440, 450 (4th Cir. 2000). Our Supreme Court has concluded that a privacy interest exists in prescription records. *State* v. *Russo*, 259 Conn. 436, 460, 790 A.2d 1132, cert. denied, 537 U.S. 879, 123 S. Ct. 79, 154 L. Ed. 2d 134 (2002).

[6] See, e.g., *State* v. *Kalphat*, 285 Conn. 367, 374–75, 939 A.2d 1165 (2008); *State* v. *Vallejo*, 102 Conn. App. 628, 635–36, 926 A.2d 681, cert. denied, 284 Conn. 912, 931 A.2d 934 (2007); see also *Kyllo* v. *United States*, 533 U.S. 27, 33, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001).

[7] "The fourth amendment has been made applicable to the states via the fourteenth amendment." (Internal quotation marks omitted.) *State* v. *Jenkins*, 298 Conn. 209, 212 n.1, 3 A.3d 806 (2010).

[8] One learned treatise has noted that "[w]hether being required to respond to a subpoena duces tecum can in fact be called a 'seizure' in the Fourth Amendment sense, of course, is in some doubt." 2 W. LaFave, Search and Seizure (4th Ed. 2004) § 4.13 (e), p. 842 n.127.

able.[9] See *State* v. *Boyd*, 295 Conn. 707, 718, 992 A.2d 1071 (2010), cert. denied, U.S. , 131 S. Ct. 1474, 179 L. Ed. 2d 314 (2011); see also *Rakas* v. *Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). We also note certain significant aspects of this case; namely, that (1) the defendant, while objecting to the use of the subpoena, did not file either a motion to suppress or a motion to quash, (2) although Reiher complied with the subpoena prior to notice to the defendant, the defendant was afforded an opportunity to raise his objection prior to disclosure of the medical records to the prosecutor and (3) the defendant presented a defense that was based on information contained in the medical records.[10] We are mindful of the inherent tension between the confidential nature of medical records and the need of the government to use such information for the enforcement of various statutes. See, e.g., *In re Grand Jury Subpoena (Medical Records of Payne)*, 150 N.H. 436, 440, 839 A.2d 837 (2004). Last, the defendant's claim developed over the course of the trial. It appears to have been raised initially as an evidentiary issue regarding statutory privileges. We do not imply or suggest that the claim is not properly before us; instead, we point out that much of the discussion regarding the medical records before the trial court did not concern the various constitutional principles

[9] There is, however, no absolute right to privacy with respect to medical records. See *United States* v. *Polan*, 970 F.2d 1280, 1285 (3d Cir. 1992), cert. denied, 507 U.S. 953, 113 S. Ct. 1367, 122 L. Ed. 2d 745 (1993); *United States* v. *Sattar*, 471 F. Sup. 2d 380, 387 (S.D.N.Y. 2006); see also *State* v. *Russo*, 259 Conn. 436, 460, 790 A.2d 1132 (privacy protection of pharmacy records or information contained therein not absolute), cert. denied, 537 U.S. 879, 123 S. Ct. 79, 154 L. Ed. 2d 134 (2002).

[10] The Washington Court of Appeals has stated: "By introducing the opinion testimony of his physician, [the defendant] abandoned his right of medical privacy and waived the statutory physician-patient privilege as to any medical testimony which tends to contradict or impeach his medical evidence." (Internal quotation marks omitted.) *State* v. *Rochelle*, 11 Wn. App. 887, 893, 527 P.2d 87 (1974), review denied, 85 Wn. 2d 1001 (1975).

discussed in this appeal. Ultimately, we agree with the state that, under the facts and circumstances of this case, neither the fourth amendment nor article first, § 7, were violated because the use of subpoena was reasonable and therefore proper.[11]

## A

We begin our analysis of this issue of first impression with the text of the fourth amendment to the United States constitution, which provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and. the persons or things to be seized." The purpose of this amendment is to constrain intrusions that are not justified in the circumstances or those made in an improper manner; it does not protect against all intrusions. *State* v. *Mubita*, 145 Idaho 925, 932, 188 P.3d 867 (2008). Our Supreme Court has explained that the fourth amendment protects against the unreasonable seizure of an individual's property. *Fleming* v. *Bridgeport*, 284 Conn. 502, 520, 935 A.2d 126 (2007). "[T]o state a constitutional violation, the [party claiming such a violation] must allege (1) [the state actor's] conduct constituted a seizure, and (2) the seizure, if one occurred, was unreasonable. . . . If a seizure has occurred, then the court must engage in a complex inquiry to determine whether that seizure was reasonable." (Citations omitted; internal quotation marks omitted.) Id.

---

[11] The defendant also argues that "[a] more generalized constitutional right to privacy under the Fourteenth Amendment's Substantive Due Process Clause provides a separate basis for finding an objective expectation of privacy in one's medical records." He does not, however, make a separate claim that the state's use of a subpoena in this case amounted to a due process violation.

"With regard to the reasonableness requirement, [i]n the ordinary case, the [Supreme] Court has viewed a seizure of personal property as per se unreasonable within the meaning of the [f]ourth [a]mendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized. . . . *The Supreme Court has nonetheless made it clear that there are exceptions to the warrant requirement.* When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the [c]ourt has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 520–21.

In *Oklahoma Press Publishing Co.* v. *Walling,* 327 U.S. 186, 208, 66 S. Ct. 494, 90 L. Ed. 614 (1946), the United States Supreme Court determined that, with respect to a subpoena, corporate records or papers were protected under the fourth amendment only against unreasonable disclosures. See also *California Bankers Assn.* v. *Shultz,* 416 U.S. 21, 67, 94 S. Ct. 1494, 39 L. Ed. 2d 812 (1974); 2 W. LaFave, Search and Seizure (4th Ed. 2004) § 4.13 (a), p. 823. In *See* v. *Seattle,* 387 U.S. 541, 544, 87 S. Ct. 1737, 18 L. Ed. 2d 943 (1967), the court explicitly stated: "It is now settled that, when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." See also *Donovan* v. *Lone Steer, Inc.,* 464 U.S. 408, 415, 104 S. Ct. 769, 78 L. Ed. 2d 567 (1984) (reaffirming holding of *Oklahoma Press Publishing Co.* v. *Walling,* supra, 186, and stating that defenses to valid administrative subpoena do not include warrant as condition precedent);

*Becker* v. *Kroll*, 494 F.3d 904, 916 (10th Cir. 2007) (investigatory or administrative subpoena, such as state administrative subpoena, need not be supported by probable cause).[12]

It is clear, therefore, that for the purposes of a fourth amendment analysis, the use of a subpoena may, in the proper circumstances, be reasonable and therefore not violate the fourth amendment. It is helpful at this point to explain certain key differences between a search warrant and a subpoena. In distinguishing the two, the United States Court of Appeals for the Fourth Circuit stated: "A warrant is a judicial authorization to a law enforcement officer to search or seize persons or things. To preserve advantages of speed and surprise, the order is issued without prior notice and is executed, often by force, with an unannounced and unanticipated physical intrusion. . . . Because this intrusion is both an immediate and substantial invasion of privacy, a warrant may be issued only by a judicial officer upon a demonstration of probable cause—the safeguard required by the Fourth Amendment. . . . The demonstration of probable cause to a neutral judicial officer places a checkpoint between the Government and the citizen where there otherwise would be no judicial supervision. . . . A subpoena, on the other hand, commences an adversary process during which the person served with the subpoena may challenge it in court before complying with its demands. . . . As judicial process is afforded before any intrusion occurs, the proposed intrusion is regulated by, and its justification derives from, that process. . . . *In short, the immediacy and intrusiveness of a search and seizure conducted pursuant*

---

[12] In his reply brief, the defendant argues that because some of the cases establishing the reasonableness standard for subpoena predate *Katz* v. *United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), they are no longer good law. We disagree with this assertion and note that several of the cases using the reasonableness test were decided after the release in 1967 of the *Katz* decision.

*to a warrant demand the safeguard of demonstrating probable cause to a neutral judicial officer before the warrant issues, whereas the issuance of a subpoena initiates an adversary process that can command the production of documents and things only after judicial process is afforded.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *In re Subpoena Duces Tecum*, 228 F.3d 341, 348 (4th Cir. 2000); see also *Farrall* v. *State*, 902 So. 2d 820, 821 (Fla. App. 2004) (warrant requires higher threshold of proof and as result, no notice or hearing required); *King* v. *State*, 276 Ga. 126, 128–29, 577 S.E.2d 764 (2003) (because of higher procedural safeguards to obtain warrant, defendant not entitled to notice and hearing). In this case, because the state used a subpoena rather than a warrant, there are no immediate or intrusive concerns requiring a showing of probable cause before a detached neutral magistrate.

Relying on these precedents, other courts have applied the reasonableness standard to subpoenas issued by, inter alia, grand juries[13] and prosecutors. See 2 W. LaFave, supra, § 4.13 (a), p. 823. For example, in *State* v. *Kelley*, 353 N.W.2d 845 (Iowa 1984), the prosecuting attorney subpoenaed certain business records regarding an investigation of misappropriation of client funds by real estate attorneys. Id., 846. The defendant successfully moved to quash the subpoena. Id., 847. On appeal, the Supreme Court of Iowa determined that probable cause is not required for the use of a subpoena and reversed the trial court's decision. Id., 846–47.

In the case of *In re Subpoena Duces Tecum*, supra, 228 F.3d 341, the United States Court of Appeals for the Fourth Circuit considered a subpoena issued by the government in connection with an investigation into

---

[13] See, e.g., *Matter of Grand Jury Subpoena Duces Tecum*, 697 F.2d 277, 281 (10th Cir. 1983).

federal health care offenses. Id., 343–44. The District Court had denied, in part, the motion to quash filed by the physician and the health care corporation. Id., 344. The Fourth Circuit first noted the statutory authority for the subpoenas. Id., 346. It then stated that "[t]he subpoena power—the authority to command persons to appear and testify or to produce documents or things—is a longstanding and necessary adjunct to the government power of investigation and inquisition . . . and to the government's duty to provide trials . . . ." (Citations omitted.) Id. Turning to the fourth amendment questions, the court reasoned: "Because a subpoena duces tecum leads to the compulsory production of private papers, a person served with a subpoena duces tecum is entitled to the Fourth Amendment's protection against unreasonableness. . . . But there is no unreasonable search and seizure, when a [subpoena], suitably specific and properly limited in its scope, calls for the production of documents which, as against their lawful owner to whom the writ is directed, the party procuring its issuance is entitled to have produced." (Citation omitted; internal quotation marks omitted.) Id., 347.

The Fourth Circuit explained that the United States Supreme Court has required that a subpoena be limited in scope, relevant in purpose and specific in directive to ensure that compliance would not be unreasonably burdensome. Id. "This standard, however, cannot be reduced to formula . . . ." (Internal quotation marks omitted.) Id. The Fourth Circuit expressly stated that because subpoenas are not warrants, they do not require probable cause. Id., 348.

Applying these legal principles to the specific facts and circumstances of the present case, we conclude that the subpoena issued by the prosecutor was reasonable, and therefore did not violate the fourth amendment. As a general rule, we note that "[a] subpoena is

an appropriate process for the production of documents that are relevant to the matter before the court." (Internal quotation marks omitted.) *State* v. *Montgomery*, 254 Conn. 694, 728, 759 A.2d 995 (2000); see generally *Hurley* v. *Connecticut Co.*, 118 Conn. 276, 283–84, 172 A. 86 (1934). The subpoena, validly served pursuant to General Statutes § 52-143, commenced a process where Reiher submitted the requested medical records under seal to the court.[14] In interpreting a statute similar to § 52-143, the Illinois Appellate Court stated: "The State's Attorney is authorized by statute in Illinois to make use of the subpoena power in conducting investigations. See 55 [Ill. Comp. Stat. Ann. §] 5/3-9005 (b) (West 1994) ('[t]he State's Attorney of each county shall have authority to appoint one or more special investigators to serve subpoenas, make return of process and conduct investigations which assist the State's Attorneys in the performance of his duties') . . . ." (Citation omitted.) *People* v. *Nohren*, 283 Ill. App. 3d 753, 758–59, 670 N.E.2d 1208 (1996), leave to appeal denied, 171 Ill. 2d 578, 677 N.E.2d 969 (1997). Such a subpoena, therefore, does not violate the fourth amendment if it is reasonable.

We first note that, prior to the records being turned over to the prosecutor, the defendant was afforded an opportunity to object.[15] This fact is of crucial significance, as it provided the defendant the opportunity to present arguments to the trial court and challenge the

---

[14] Although it did not occur in the present case, Reiher also had the opportunity to alert the defendant to the subpoena and to object independently by way of a motion to quash.

[15] We note that some statutes require that notice be given to an individual before medical records can be disclosed. See, e.g., *Klossett* v. *State*, 763 So. 2d 1159 (Fla. App. 2000); *State* v. *Santos*, 996 A.2d 647 (R.I. 2010); see also *King* v. *State*, 272 Ga. 788, 793–94, 535 S.E.2d 492 (2000) (failure to afford individual notice of subpoenaed medical records resulted in violation of state constitutional right to privacy); *In re Grand Jury Subpoena (Medical Records of Payne)*, supra, 150 N.H. 447 (state must furnish defendant with notice of grand jury subpoena of medical records).

propriety of the state's subpoena prior to the disclosure of any of his medical information. "The fourth amendment is satisfied if the subpoenaed party is allowed 'to question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it, by raising objections in an action in . . . court.' *Donovan v. Lone Steer, Inc.*, [supra, 464 U.S. 415]." *Matter of Criminal Investigation, 7th District Court No. CS-1*, 754 P.2d 633, 642 (Utah 1988); see also 2 W. LaFave, Search and Seizure, supra, § 4.13 (e), pp. 843–44 (noting opportunity to challenge subpoena arguably may afford individual greater protection than probable cause requirement of search warrant). Cf. *People v. Smith*, 259 Ill. App. 3d 492, 503, 631 N.E.2d 738 (lack of effective opportunity for defendant to challenge subpoena constituted fatal flaw in procedure), leave to appeal denied, 156 Ill. 2d 565, 638 N.E.2d 1123 (1994); *State v. Yount*, 182 P.3d 405 (Utah App. 2008) (same). Additionally, the materials were not immediately disclosed to the prosecutor, but sent to the court under seal. See *People v. Wilson*, 164 Ill. 2d 436, 458, 647 N.E.2d 910 (1994) (Illinois Supreme Court held that subpoenaed materials must be turned over to court prior to disclosure to requesting party), cert. denied, 516 U.S. 876, 116 S. Ct. 204, 133 L. Ed. 2d 137 (1995); see also *People v. Feldmeier*, 286 Ill. App. 3d 602, 603–604, 676 N.E.2d 723 (same), leave to appeal denied, 173 Ill. 2d 533, 684 N.E.2d 1338 (1997).

We turn next to the question of whether the subpoena itself was reasonable for fourth amendment purposes. The record reveals that at the time of the issuance of the subpoena, a criminal proceeding had been commenced against the defendant. Further, the time frame of the records sought was reasonable and relevant in purpose and specific in directive in light of the charges against the defendant and his anticipated defense. See *In re*

*Subpoena Duces Tecum*, supra, 228 F.3d 347. The subpoenaed medical records served as a basis to challenge and impeach the defendant's expert testimony that he was not intoxicated from his narcotic medication because he had grown accustomed to the side effects after using them properly for an extended period of time. This is not a case where the prosecutor attempted to cast a wide net to locate potentially damaging evidence against the defendant. Instead, the state used a limited subpoena for a specific purpose. We also note that the court reviewed the records, prior to distribution to the state, in an effort to balance the state's needs with the privacy rights of the defendant. We conclude, on the basis of the foregoing, that the subpoena was reasonable and the court properly granted the state access to the requested medical records without violating the fourth amendment to the federal constitution.

B

Turning to the defendant's state constitutional claim, we set forth certain pertinent legal principles regarding our state constitutional jurisprudence. "It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . Furthermore, although we often rely on the United States Supreme Court's interpretation of the amendments to the constitution of the United States to delineate the boundaries of the protections provided by the constitution of Connecticut, we have also recognized that, in some instances, our state constitution provides protections beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court." (Internal quotation marks omitted.) *State* v. *Jenkins*, 298 Conn. 209, 261, 3 A.3d 806 (2010). Put another way, "in a proper case, the law of the land may not, in state constitutional

context, also be the law of the state of Connecticut." (Internal quotation marks omitted.) *State* v. *Wade*, 297 Conn. 262, 288, 998 A.2d 1114 (2010); see also *State* v. *Kimbro*, 197 Conn. 219, 235, 496 A.2d 498 (1985). With respect to article first, § 7, of the state constitution, our Supreme Court has determined that in certain instances, it affords greater protection than the fourth amendment to the United States constitution. *State* v. *Davis*, 283 Conn. 280, 305–306, 929 A.2d 278 (2007).

"In *State* v. *Geisler*, [222 Conn. 672, 684–85, 610 A.2d 1225 (1992)] we set forth six factors to be used in analyzing an independent claim under this state's constitution: (1) the text of the operative constitutional provisions; (2) related Connecticut precedents; (3) persuasive relevant federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of our constitutional forebears; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies." *State* v. *Lockhart*, 298 Conn. 537, 546–47, 4 A.3d 1176 (2010).

We begin with the text of article first, § 7, which states: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation." With respect to the first *Geisler* factor, our Supreme Court has stated: "[T]his court repeatedly has observed that the language of article first, § 7, of the state constitution closely resembles the language of the fourth amendment to the federal constitution." *State* v. *Davis*, supra, 283 Conn. 306; see also W. Horton, The Connecticut State Constitution (1993) p. 51 ("there appears to be little textual difference between the state and federal provisions").

In a similar nature, regarding the fifth *Geisler* factor, we have indicated: "The circumstances surrounding the adoption of article first, [§ 7, do] not suggest [a historical basis for an independent meaning from that of the fourth amendment]. The declaration of rights adopted in 1818 appears to have its antecedents in the Mississippi constitution of 1817, which in turn derived from the federal bill of rights and the Virginia declaration of rights of 1776. . . . The language of article first, § 7, which was based upon the fourth amendment, was adopted with little debate. . . . Thus, the circumstances surrounding the adoption of article first, § 7, lend weight to the view that, in most cases, a practice permitted under the fourth amendment is permissible under article first, § 7." (Internal quotation marks omitted.) *State* v. *Sulewski*, 98 Conn. App. 762, 775 n.12, 912 A.2d 485 (2006); see also *State* v. *Mikolinski*, 256 Conn. 543, 548–49, 775 A.2d 274 (2001). Neither the first nor the fifth *Geisler* factors, therefore, weigh in favor of an independent state constitutional claim.

With respect to the second, third and fourth *Geisler* factors, the defendant has failed to establish that relevant Connecticut, federal and sibling state precedent support his claim of greater protection in this case under article first, § 7. In part I A of this opinion, we have discussed many of the federal cases relevant to this issue. Moreover, none of the Connecticut or federal cases cited in the defendant's brief provides direct support for the claim of enhanced protection under article first, § 7.

We note that in *State* v. *Skinner*, 10 So. 3d 1212, 1219 (La. 2009), the Supreme Court of Louisiana concluded that a search warrant was required to obtain an individual's medical and prescription records. In that case, however, the court relied, at least in part, on the explicit right to privacy found in the Louisiana constitution. Id., 1215; see also La. Const., art. first, § 5 ("[e]very person

shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions or privacy"). Other states have similar explicit constitutional rights to privacy; see *Falcon* v. *Alaska Public Offices Commission*, 570 P.2d 469, 476 (Alaska 1977) (discussing article first, § 22, of Alaska constitution providing that " '[t]he right of the people to privacy is recognized and shall not be infringed' "); *State* v. *Dolan*, 283 Mont. 245, 257, 940 P.2d 436 (1997) ("medical records requested by the prosecutor are protected by a constitutional right of privacy, as provided by Article II, Section 10, of the Montana Constitution"); or have determined that their implicit state constitutional right to privacy is "far more extensive" than the United States constitution. *King* v. *State*, 272 Ga. 788, 789, 535 S.E.2d 492 (2000). Our state constitution does not contain an explicit privacy right and, although our courts occasionally have interpreted article first, § 7, as affording Connecticut citizens with additional protections than the fourth amendment,[16] those instances have been the exception, rather than the rule. Moreover, none of the cases cited by the defendant addresses the issue of whether a reasonable subpoena violates article first, § 7. We conclude, therefore, that the second, third and fourth *Geisler* factors do not weigh in favor of the defendant.

The sixth *Geisler* factor requires an examination of the relevant economic and sociological factors as well

---

[16] Our Supreme Court "has determined that, in certain respects, article first, § 7, of the state constitution affords greater protection than the fourth amendment to the United States constitution. E.g., *State* v. *Miller*, 227 Conn. 363, 377, 630 A.2d 1315 (1993) (article first, § 7, requires police to obtain warrant to search impounded automobile); *State* v. *Geisler*, [supra, 222 Conn. 691–92], (emergency exception to warrant requirement is narrower under article first, § 7, than under federal constitution); *State* v. *Marsala*, 216 Conn. 150, 171, 579 A.2d 58 (1990) (good faith exception to warrant requirement does not exist under article first, § 7, of state constitution); *State* v. *Dukes*, 209 Conn. 98, 120–21, 547 A.2d 10 (1988) (search incident to arrest exception to warrant requirement is narrower under article first, § 7, than under federal constitution)." *State* v. *Davis*, supra, 283 Conn. 305–306.

as public policy. *State* v. *Lockhart*, supra, 298 Conn. 564. The defendant argues that patients are less likely to inform their physicians of medical problems, negatively impacting treatment and that medical procedures often include highly private matters. We conclude, however, that due to the procedures employed by the court in the present case, the defendant's concern of "unfettered exploration" into medical records without prior court approval is unwarranted. As we have noted, the medical records were delivered under seal to the court and not disclosed to the state until after the defendant had an opportunity to raise his objections. Moreover, the court limited the disclosure of the records to those individuals necessary. The court properly balanced the needs of the state with the privacy interests of the defendant. Accordingly, we conclude that the defendant's rights under article first, § 7, of the Connecticut constitution were not violated.

## II

The defendant next claims that the court improperly found that his medical records were not privileged statutorily. Specifically, he argues that disclosure of his medical records violated General Statutes §§ 52-146e and 17a-688. Even if we assume that these statutes were violated, the defendant has failed to carry his burden of showing harm.

During the initial discussion regarding the defendant's medical records, defense counsel argued that certain records would be privileged as psychiatric-psychological records. After reviewing the records supplied by Reiher, defense counsel later indicated to the court that medical records from at least one psychological facility had been turned over to the state. After additional discussion, both on and off the record, the court noted that, with the defendant's consent, it had reviewed the medical records at issue. With a few

exceptions, it ruled that the records would be disclosed to the state.[17]

We begin our analysis by setting forth the appropriate standard of review. "The applicable standard of review for evidentiary challenges is well established. We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Beavers*, 290 Conn. 386, 396–97, 963 A.2d 956 (2009).

"A common law privilege for communications made by a patient to a physician has never been recognized in this state." (Internal quotation marks omitted.) *State* v. *Anderson*, 74 Conn. App. 633, 653, 813 A.2d 1039, cert. denied, 263 Conn. 901, 819 A.2d 837 (2003). In *Anderson*, this court held that the statutory privilege

---

[17] Specifically, the court stated: "In making that determination, the court will note that it seems to me, based upon how this case has been presented to the court, that the principal issue in this operating under the influence case is whether or not the defendant was under the influence of certain medications and whether those medications impaired the defendant's operation of a motor vehicle at the relevant time.

"The fact that this case is primarily a case about the defendant's medications obviously implicates the fact that the medications the defendant has been on at certain times are psychotropic in nature. And because they're psychotropic in nature, obviously they are prescribed at least in part for psychiatric reasons, I don't believe that under the circumstances of this case that the state should be precluded from knowing what medications the defendant was on, or how those medications may have been working on the defendant at relevant periods of time."

set forth in General Statutes § 52-146o[18] applies to civil, and not criminal, actions. Id., 653–54; see also *Edelstein* v. *Dept. of Public Health & Addiction Services*, 240 Conn. 658, 662–64, 692 A.2d 803 (1997); C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 5.44.2, p. 252. The defendant, however, does not rely on the general physician-patient privilege; instead, he relies on protections afforded to communications between a patient and a psychiatrist found in General Statutes §§ 52-146d and 52-146e,[19] as well as § 17a-688.[20]

[18] General Statutes § 52-146o (a), which the legislature enacted in 1990, provides: "Except as provided in sections 52-146c to 52-146j, inclusive, and subsection (b) of this section, in any civil action or any proceeding preliminary thereto or in any probate, legislative or administrative proceeding, a physician or surgeon, as defined in subsection (b) of section 20-7b, shall not disclose (1) any communication made to him by, or any information obtained by him from, a patient or the conservator or guardian of a patient with respect to any actual or supposed physical or mental disease or disorder or (2) any information obtained by personal examination of a patient, unless the patient or his authorized representative explicitly consents to such disclosure."

[19] General Statutes § 52-146e (a) provides: "All communications and records as defined in section 52-146d shall be confidential and shall be subject to the provisions of sections 52-146d to 52-146j, inclusive. Except as provided in sections 52-146f to 52-146i, inclusive, no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corporation or governmental agency without the consent of the patient or his authorized representative."

Reiher's curriculum vitae, which was admitted into evidence, indicated that he has a private practice in the field of internal medicine. It does not indicate how much of his practice, if any, is devoted to the treatment of psychiatric issues. General Statutes § 52-146d (7) defines " '[p]sychiatrist' " as "a person licensed to practice medicine who devotes a substantial portion of his time to the practice of psychiatry, or a person reasonably believed by the patient to be so qualified." In his brief, the defendant argues that Reiher treated him for a variety of psychiatric issues, including anxiety disorder, insomnia, and depression, and prescribed medications for these medical conditions. As a result, the defendant maintains that there was an objective basis for him to believe that Reiher acted as a psychiatrist pursuant to this statutory definition for purposes of § 52-146e.

[20] General Statutes § 17a-688 (c) provides: "No person, hospital or treatment facility may disclose or permit the disclosure of, nor may the department disclose or permit the disclosure of, the identity, diagnosis, prognosis

Even if we were to conclude that the court improperly admitted the defendant's medical records in violation of these statutes, he has failed to establish that such error was harmful. As we have noted previously in this opinion, the thrust of the state's case was that the defendant abused his narcotic medication and, as a result, was intoxicated while operating a motor vehicle. The state used other evidence outside of the mental health records to prove that the defendant had been abusing his narcotic medication and therefore was intoxicated as a result of this misuse. Further, the defendant has not demonstrated in his briefs to this court precisely how he was harmed by this evidence. Our Supreme Court has stated that one of the most important factors in determining whether an improper evidentiary ruling was harmful is whether such evidence impacted the trier of fact and the result of the trial. *State* v. *Beavers*, supra, 290 Conn. 419. In this case, the court, as the trier of fact, clearly set forth its conclusion regarding the criminal conduct and focused solely on the issue of the defendant's abuse of his narcotics. This court has a fair assurance that any such error regarding the admission into evidence of any psychiatric-psychological records did not substantially affect the outcome. After carefully reviewing the defendant's brief, we conclude that he failed to establish the type of harm required for a reversal on the basis of this claim.

### III

The defendant next claims that there was insufficient evidence to support his conviction under § 21a-257. Specifically, he argues that the state failed to prove the

---

or treatment of any such patient that would constitute a violation of federal statutes concerning confidentiality of alcohol or drug patient records and any regulations pursuant thereto, as such federal statutes and regulations may be amended from time to time. The department shall adopt regulations, in accordance with chapter 54, to protect the confidentiality of any such information that is obtained by the department."

manner in which the specific narcotics found in the center console of the defendant's vehicle were delivered to the defendant. We disagree.

As a preliminary matter, we set forth the legal principles and standard of review that govern our resolution of this issue. "The standard for reviewing sufficiency of the evidence claims is well settled in this state. . . . [O]ur courts apply a two-prong test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"[I]n viewing evidence which could yield contrary inferences, the [trier of fact] is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the [trier of fact's] function is to draw whatever inferences from evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Jagat*, 111 Conn. App. 173, 177, 958 A.2d 206 (2008).

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier's] verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in

part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Gore*, 96 Conn. App. 758, 763, 901 A.2d 1251 (2006), aff'd, 288 Conn. 770, 955 A.2d 1 (2008).

Section 21a-257 provides in relevant part: "A person to whom or for whose use any narcotic drug has been prescribed, sold or dispensed by a physician, dentist, pharmacist or other person authorized under the provisions of section 21a-248 . . . may lawfully possess it only in the container in which it was delivered to the recipient by the person selling or dispensing the same except as may be authorized by regulations adopted hereunder."

Police Officer Peggy Sue Beech Clouser testified that on the night of his arrest, the defendant stated that the pills located in the center console of the vehicle were prescribed to him.[21] More specifically, the defendant had told her that the pills were his prescriptions, that he had placed them in his pocket before he left and that he had just placed them in the center console. A search of the vehicle did not reveal any containers for narcotics in the defendant's vehicle.

During cross-examination, Clouser testified that the defendant's parents brought to the police station the prescription medication bottles with the defendant's name and that the pills found in the center console belonged in those bottles. Police Officer Brian Fantry testified that the defendant had told him that the medication found in the center console of his vehicle initially had been in bottles and that the defendant had taken several of them out in order to carry them in the vehicle.

---

[21] There is no dispute that some of the pills were narcotics. See part IV of this opinion.

Additionally, the defendant's mother, Patricia Legrand, testified that she had received a telephone call from the defendant on May 18, 2007, while he was at the police station. She stated that, after speaking with the defendant, she went to the station with his prescription bottles. She testified that he had received his prescription medications in bottles and, in the past when she had picked up the defendant's medicine, they always had been dispensed in a bottle.

On the basis of this evidence, we conclude that there was sufficient evidence to support the defendant's conviction with respect to § 21a-257. The trial court, as the trier of fact, reasonably could conclude that narcotic pills found in the center console of the defendant's vehicle at the time of his arrest were not in the container in which they were dispensed.[22]

## IV

The defendant's final claim is that § 21a-257 is unconstitutionally vague as applied to his conduct in this case.[23] Specifically, he argues that § 21a-257 is unconsti-

---

[22] The defendant also challenges the waiver rule set forth by our Supreme Court in *State* v. *Perkins*, 271 Conn. 218, 228–45, 856 A.2d 917 (2004), that permits "a court to find a defendant guilty even if the necessary elements of proof were obtained after the state rested . . . ." (Citation omitted.) "Because the waiver rule has been deemed constitutional; we review [a] defendant's insufficiency of the evidence claim by examining all of the evidence before the jury. It is the propriety of the jury's verdict of guilty, not the propriety of the court's denial of a motion for a judgment of acquittal after the state's case-in-chief has been concluded, that we review." (Internal quotation marks omitted.) *State* v. *Dickman*, 119 Conn. App. 581, 586–87 n.7, 989 A.2d 613, cert. denied, 295 Conn. 923, 991 A.2d 569 (2010).

[23] "The general rule is that the constitutionality of a statutory provision being attacked as void for vagueness is determined by the statute's applicability to the particular facts at issue. . . . To do otherwise, absent the appearance that the statute in question intrudes upon fundamental guarantees, particularly first amendment freedoms, would be to put courts in the undesirable position of considering every conceivable situation which might possibly arise in the application of [the statute]. . . . Thus, outside the context of the first amendment, in order to challenge successfully the facial validity of a statute, a party is required to demonstrate as a threshold matter that the statute may not be applied constitutionally to the facts of [the] case."

tutionally vague due to (1) a lack of notice and arbitrary enforcement and (2) the doctrine of desuetude.[24]

A

The defendant first argues that § 21a-257 is unconstitutionally vague as applied due to a lack of notice and arbitrary enforcement. Additionally, he claims that the lack of a scienter requirement in the statute results in it being unconstitutionally vague. We are not persuaded.

The following additional facts are necessary for our discussion. At the start of the trial, the parties stipulated that two of the pills found in the center console of the defendant's vehicle at the time of his arrest were fifteen milligrams of Oxycodone and three were forty milligrams of Oxycodone. Reiher, the defendant's treating physician, testified that Oxycodone is a narcotic pain medicine. He also explained that the forty milligram version of the medication is a "long acting narcotic analgesic" for pain control. Its pain control effect lasted twelve hours, while the effect of the fifteen milligram pill would be four to six hours. Accordingly, the defendant had thirty-six hours worth of a long acting narcotic pain medication and eight to ten hours worth of shorter acting narcotic pain medicine in the center console of his car. Further, one of the police officers testified that the defendant had stated that he had gone out to get something to eat and that, prior to leaving, he had taken his "pain medications . . . ."

After the state rested, the court considered various motions filed by the defendant, including his motion to

(Internal quotation marks omitted.) *State* v. *Lewis*, 273 Conn. 509, 515, 871 A.2d 986 (2005).

[24] The phrase "desuetude" has been defined as follows: "Disuse; cessation or discontinuance of use, especially in the phrase, 'to fall into desuetude.' Applied to obsolete practices and statutes." Black's Law Dictionary (6th Ed. 1990). Furthermore, to conclude a linguistic discussion at oral argument, we note that the word is pronounced "dĕs⁄wĭ tōōd′." American Heritage College Dictionary (4th Ed. 2004).

dismiss on the ground that § 21a-257 is unconstitutionally vague.[25] Defense counsel argued that "an average person would have no specific knowledge that it was against the law to take a few items, two prescription medications, and place them in their pocket, so that they could not take the full bottle with them. . . . But I submit that there's a lack of notice, or it allows arbitrary enforcement." The court denied the defendant's motion to dismiss.[26]

"As a preliminary matter, we note that legislative enactments carry with them a strong presumption of constitutionality. . . . A party challenging the constitutionality of a validly enacted statute bears the heavy burden of proving the statute unconstitutional beyond a reasonable doubt. . . . In the absence of weighty countervailing circumstances, it is improvident for the court to invalidate a statute on its face. . . . In construing a statute, the court must search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." (Citations omitted; internal quotation marks omitted.) *State* v. *Caracoglia*, 78 Conn. App. 98, 105–106, 826 A.2d 192, cert. denied, 266 Conn. 903, 832 A.2d 65 (2003).

"The determination of whether a statutory provision is unconstitutionally vague is a question of law over which we exercise de novo review. . . . In undertaking such review, we are mindful that [a] statute is not void for vagueness unless it clearly and unequivocally is

[25] On the first day of trial, counsel for the defendant stated that he had filed a motion to dismiss the § 21a-257 count on the basis of constitutional vagueness grounds. The parties agreed, with the court's approval, that it would be more efficient to raise the claim in a motion for a judgment of acquittal.

[26] Specifically, the court stated: "The court cannot find, based upon the arguments of counsel, that the statute is vague as a matter of law either facially or as applied. An average person, I think, who's been prescribed a narcotic would know that you can't carry those narcotics in the center console of your vehicle."

unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to him, the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning. . . .

"The United States Supreme Court has set forth standards for evaluating vagueness. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. . . . [A] law forbidding or requiring conduct in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process of law. . . .

"Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications. . . . Therefore, a legislature

[must] establish minimal guidelines to govern law enforcement." (Citations omitted; internal quotation marks omitted.) *State* v. *Winot*, 294 Conn. 753, 758–61, 988 A.2d 188 (2010); see also *State* v. *Scruggs*, 279 Conn. 698, 709–10, 905 A.2d 24 (2006).

The defendant specifically disavows any claim that the language of § 21a-257 is unclear.[27] Although he claims that there was no evidence in the record that he knew of the requirement of § 21a-257, the defendant focuses his argument on the fact that this statute does not contain any intent or knowledge requirement.

"We begin our analysis of this claim with the time worn maxim that everyone is presumed to know the law, and that ignorance of the law excuses no one . . . . Those tenets are founded upon public policy and in necessity, and the idea [behind] them is that one's acts must be considered as having been done with knowledge of the law, for otherwise its evasion would be facilitated and the courts burdened with collateral inquiries into the content of men's minds." (Citation omitted; internal quotation marks omitted.) *State* v. *Surette*, 90 Conn. App. 177, 182, 876 A.2d 582 (2005); see also *State* v. *Knybel*, 281 Conn. 707, 713, 916 A.2d 816 (2007); *State* v. *Kurzatkowski*, 119 Conn. App. 556, 566, 988 A.2d 393, cert. denied, 296 Conn. 902, 991 A.2d 1104 (2010).

In *State* v. *Swain*, 245 Conn. 442, 718 A.2d 1 (1998), our Supreme Court stated: "While the general rule at common law was that the scienter was a necessary element in the indictment and proof of every crime, and this was followed in regard to statutory crimes,

---

[27] Specifically, the defendant's brief states: "While the words of the statute itself are plain enough—and the defendant eschews any argument that the phrasing is difficult to understand—no reasonable patient who fills a duly authorized prescription for narcotic medication would know that it is unlawful to carry even small doses of the medication outside the container dispensed by a pharmacy or health care provider."

even where the statutory definition did not in terms include it . . . [t]he legislature may, if it so chooses, ignore the common-law concept that criminal acts require the coupling of the evil-meaning mind with the evil-doing hand and may define crimes which depend on no mental element, but consist only of forbidden acts or omissions. . . . Whether or not a statutory crime requires mens rea or scienter as an element of the offense is largely a question of legislative intent to be determined from the general scope of the act and from the nature of the evils to be avoided." (Citation omitted; internal quotation marks omitted.) Id., 454; see also State v. Pascucci, 164 Conn. 69, 74, 316 A.2d 750 (1972). Given this jurisprudence, we conclude that § 21a-257 is not unconstitutionally vague despite the lack of intent or knowledge requirement.

B

The defendant next argues that § 21a-257 is unconstitutionally vague due to the doctrine of desuetude. Specifically, he maintains that he had no notice that his actions were illegal due to the rarity of prosecutions for this offense, and therefore the statute is invalid. We disagree.

In his motion for a judgment of acquittal, the defendant argued that the common law of desuetude applied to this case. He claimed that this doctrine "is based on the notion that a statute that's not used a lot can become vague and, therefore, subject to this kind of challenge [being unconstitutionally void] because it's not generally known that this can be the basis for a criminal charge."

In denying the defendant's motion, the court stated: "And I don't think there's any basis to say, there's nothing in the record that would establish how often the [statute has] been used. I am aware just from conducting

a daily [geographical area courthouse] docket that this charge does appear from time to time. And certainly that wouldn't rise to the level of the type of desuetude . . . that [counsel for the defendant] is referring to."

In his argument to the trial court and on appeal, the defendant cites to a footnote in our decision in *State v. Linares*, 32 Conn. App. 656, 630 A.2d 1340 (1993), rev'd in part, 232 Conn. 345, 655 A.2d 737 (1995). Specifically, we discussed this doctrine as follows: "The doctrine of desuetude, the concept that a statute may be void because of its lack of use, is founded on the constitutional concept of fairness embodied in federal and state constitutional due process and equal protection clauses. See *Poe* v. *Ullman*, 367 U.S. 497, 81 S. Ct. 1752, 6 L. Ed. 2d 989 (1961). The undeviating policy of nullification by Connecticut of its anti-contraceptive laws throughout all the many years that they have been on the statute books bespeaks more than prosecutorial paralysis. Id., 502. Each statute must be judged in terms of whether the defendant had fair notice that she might be prosecuted pursuant to it. [*Committee on*] *Legal Ethics* v. *Printz*, [187 W. Va. 182] 416 S.E.2d 720 [1992]. Determinative factors in the application of the doctrine are whether the statute involves traditional criminal behavior, whether it has been openly, notoriously and pervasively violated without prosecution for a long period of time, and whether there has been a conspicuous policy of nonenforcement. Id., [188]. Here, the defendant did not raise the doctrine at the trial level, although she mentions the doctrine in her appellate brief. We, therefore, have no basis on which to determine the applicability of the doctrine in this case." (Internal quotation marks omitted.) *State* v. *Linares*, supra, 662 n.11; see generally 1A J. Sutherland, Statutory Construction (7th Ed. Singer 2009) § 23:26, pp. 533–37.

Even if we were to assume, without deciding, that the *Printz* test[28] set forth by the Supreme Court of Appeals of West Virginia is the appropriate manner to determine whether the doctrine of desuetude applies to § 21a-257, we conclude that the defendant has failed to establish that the test has been met in this case.

We acknowledge that there is not a significant amount of reported cases that cite to § 21a-257 or its predecessors. We do note, however, that such cases do exist. See *State* v. *Belanger*, 148 Conn. 57, 167 A.2d 245 (1961); *State* v. *Kamel*, 115 Conn. App. 338, 972 A.2d 780 (2009); *State* v. *Coccomo*, 115 Conn. App. 384, 972 A.2d 757, cert. granted on other grounds, 293 Conn. 909, 978 A.2d 1111 (2009); *State* v. *Liebowitz*, 7 Conn. App. 403, 509 A.2d 43 (1986); *State* v. *Anonymous (1971-20)*, 6 Conn. Cir. Ct. 583, 280 A.2d 816 (1971); *State* v. *Fausel*, Superior Court, judicial district of Ansonia-Milford at Milford, Docket No. CR-05-0057485 (November 2, 2006), rev'd, 109 Conn. App. 820, 953 A.2d 891, rev'd, 295 Conn. 785, 993 A.2d 455 (2010).

Additionally, the record is devoid of evidence that § 21a-257 has been openly, notoriously and pervasively violated without prosecution for a long period of time or that there has been a conspicuous policy of nonenforcement. The argument of defense counsel is not a substitute for evidence. *State* v. *Santangelo*, 205 Conn. 578, 585, 534 A.2d 1175 (1987). Given this austere record, we are unable to apply the doctrine of desuetude to this case. See *State* v. *Linares*, supra, 32 Conn. App. 662 n.11; see also *State* v. *Donley*, 216 W. Va. 368, 374, 607 S.E.2d 474 (2004) (court found defendant failed to present sufficient evidence to satisfy *Printz* test and claim regarding desuetude failed); cf. *State* v. *Blake*,

---

[28] We note that the West Virginia courts have continued to use the *Printz* test. See *State* v. *Donley*, 216 W. Va. 368, 373, 607 S.E.2d 474 (2004); *State* v. *Blake*, 213 W. Va. 656, 660, 584 S.E.2d 512 (2003).

213 W. Va. 656, 660–61, 584 S.E.2d 512 (2003) (sheriff testified that law had never been enforced).

The judgment is affirmed.

In this opinion the other judges concurred.